1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

                              ----oo0oo----

11

12  TODD SHOOK and HERSCHEL          CIV. NO. 1:14-1415 WBS BAM
    BERRINGER, on behalf of
13  himself and others similarly     MEMORANDUM OF DECISION, FINDINGS
    situated, and on behalf of       OF FACT AND CONCLUSIONS OF LAW
14  all other "aggrieved"
    employees,
15
                  Plaintiffs,
16
        v.
17
    INDIAN RIVER TRANSPORT CO., a
18  Florida Corporation,

19                Defendants.

20
                              ----oo0oo----
21

22          Plaintiffs, truck drivers formerly employed by Indian

23  River Transport Co. ("Indian River"), brought this action on

24  behalf of themselves and similarly aggrieved employees against

25  Indian River alleging various violations of California law,

26  including 1) Labor Code § 226.7 (failure to provide mandated rest

27  breaks); 2) Labor Code § 226(a) (failure to provide accurate

28  itemized wage statements); 3) Labor Code §§ 2699, et seq.

                                    1

1  (California Private Attorneys General Act ("PAGA")) (failure to
2  separately compensate for rest breaks and unpaid wages); 4)
3  Business & Professions Code § 17200 (California Unfair
4  Competition Law); 5) Labor Code §§ 201 and 203 (failure to
5  compensate employees for non-driving work before and after
6  employees' shifts and failure to timely pay compensation and
7  wages to former employees); and 6) Labor Code § 226.2 (failure to
8  provide accurate itemized wage statements and separately
9  compensate for rest and recovery periods and other nonproductive
10 time).  The gravamen of their claims is that Indian River
11 violated the California Labor Code by not providing its drivers
12 with rest breaks, not compensating them for rest breaks and other
13 time they were working but not driving, and by providing them
14 with wage statements that did not include all the information
15 required by the Labor Code.

16         After a two-day bench trial and extended closing
17 arguments, the matter was submitted to the court for decision.
18 Having considered the evidence and arguments of counsel, and
19 having read and considered the briefs, the court finds in favor
20 of defendant Indian River on all claims.  This memorandum
21 constitutes the court's findings of fact and conclusions of law
22 pursuant to Federal Rule of Civil Procedure 52(a).

23 I.   <u>Findings of Fact</u>

24         1.   Plaintiffs Shook and Berringer and other aggrieved
25 employees are current and former California-resident drivers
26 ("California drivers") employed by Indian River.

27         2.   Plaintiff Shook worked for Indian River from May
28 to October 2012 and plaintiff Berringer worked for Indian River

2

1   from November 2012 to January 2014.

2          3.   Plaintiffs paid California state income taxes on

3   all their earnings for Indian River.  Plaintiffs also received

4   all their Indian River wage statements in California.

5          4.   Indian River is a Florida corporation with its

6   headquarters in Winter Haven, Florida.  Indian River offers

7   liquid food-grade tank carrier services nationwide, transporting

8   products such as milk and orange juice.

9          5.   Indian River's administrative staff and management

10  are located at Indian River's headquarters in Winter Haven.  The

11  headquarters is responsible for payroll and other back office

12  functions, including the issuing of wage statements and the

13  resulting electronic deposits of paychecks, and drivers are hired

14  out of Winter Haven and trained there.  The Winter Haven facility

15  also has a tank wash and maintenance facilities.  The Winter

16  Haven facility provides 24-hour dispatch service, including for

17  drivers in the western United States after hours.

18         6.   Indian River provides transportation services

19  across the country.  Drivers typically spend several days or

20  weeks away from home, during which they pick up and drop off

21  product between suppliers and recipients that are 1-5 days apart.

22  The area where a driver has his or her residence will normally

23  determine only the beginning and end of the overall trip.  Thus,

24  a driver who lives in California will usually begin and end his

25  or her overall trip in California but may spend the majority of

26  that time outside California.  Indian River has about 25

27  customers in California.

28         7.   Although Indian River dispatches most of its

1   trucks out of it headquarters in Winter Haven, it has facilities

2   in Clovis, New Mexico and in Turlock, California, with

3   dispatchers in both locations.  There are no drivers based in the

4   Turlock facility, and its California drivers live throughout

5   California.  The Turlock facility, which is much smaller than the

6   Winter Haven facility, provides light maintenance for Indian

7   River trucks and has two dispatchers and only a few other

8   employees.  The Turlock facility also has a small lounge that

9   drivers may use and parking spots where drivers can leave their

10   trucks after hours.  Drivers may also send paperwork to Indian

11   River's headquarters from the Turlock facility, though they were

12   not required to do so and could submit some, if not all,

13   paperwork at commercial truck rest stops across the country.  The

14   Turlock facility does not have shower facilities or an indoor

15   restroom for drivers, who may use a single portable toilet

16   outside the facility.

17        8.   Indian River hires and employs drivers nationwide,

18   of which there are 600-650 at any time.  In 2016, Indian River

19   had approximately 50 drivers at any particular time who were

20   residing in California.  Indian River drivers are dispatched

21   based upon freight demands and the location of drivers at the

22   time of demand, not their place of residence.  Defendant

23   estimates that based on fuel and tax records, Indian River

24   drivers, including those living in California, spend on average

25   15-30% of their time driving in California.

26        9.   While some California drivers spend almost no time

27   in California, others spend nearly half their time in the state

28   in any particular pay period.  These figures vary from driver to

1   driver and from one week to the next, depending on driver

2   preferences and demand.

3          10.   Until September 5, 2016, all Indian River drivers

4   throughout the United States were generally only paid "piece-

5   rate" or per mile driven, at a rate of approximately $.41 per

6   mile.  Plaintiffs and other drivers were not separately paid for

7   rest breaks or paid for rest breaks at all.  Plaintiffs were also

8   not paid for other "nonproductive" time related to their work as

9   drivers, including time spent on pre- and post-trip safety

10  inspections, fueling, loading and unloading, waiting time before

11  loading and unloading, tank washes, and waiting time before the

12  tank washes.  Defendant's compensation system was the same for

13  all of its drivers.

14         11.   Until September 5, 2016, Indian River wage

15  statements identified the dates of each trip during the weekly

16  pay period, and the rate and dollar amount paid for that trip.

17  The wage statements did not list the actual hours worked, whether

18  driving, on duty but not driving, or while on break, though

19  drivers recorded such time on daily logs.  The wage statements

20  also did not list any hourly rates for drivers, with the

21  exception of certain hourly work not at issue in this case.  (See

22  Pls.' Exs. 1-2.)

23         12.   Indian River drivers were informed of their

24  obligations to comply with federal regulations regarding rest

25  breaks and the penalties that would result from failure to

26  comply.  Specifically, drivers were informed of federal

27  regulations requiring drivers to take a 30-minute, off-duty break

28  within 8 hours of coming on duty, to not exceed more than 11

1   hours of driving in a 14-hour period, and to be off-duty for at

2   least 10 hours after 14 hours of work.  Drivers were also

3   informed of federal regulations prohibiting working more than 70

4   hours in an 8-day period.  Drivers were also required to maintain

5   30-day and daily logs (prior to the implementation of electronic

6   logs) recording hours driving, hours on-duty but not driving, and

7   hours off-duty.  Indian River drivers were warned of the

8   punishments that Indian River would impose for failure to comply

9   with federal regulations.  (See, e.g., Pls.' Ex. A-10 (Indian

10  River employee handbook).)

11      13.   Defendant did not schedule rest breaks for its

12  drivers, as drivers were permitted and encouraged to take rest

13  breaks for safety and comfort reasons when they wanted.

14  Defendant's rest break policy was the same for all its drivers,

15  and Indian River drivers understood that they were free to take

16  breaks as desired.

17      14.   Indian River did not discourage its drivers from

18  taking rest breaks.  In that regard, the court does not find the

19  testimony of Jeffrey Pilon credible to the extent that he claimed

20  he was punished four times in connection with taking rest breaks.

21  Even assuming Mr. Pilon was punished in connection with his rest

22  breaks as he claimed, those isolated episodes do not establish

23  that Indian River discouraged any other drivers from taking rest

24  breaks, including plaintiffs Shook and Berringer.  The court

25  finds the testimony of all other witnesses to be substantially

26  credible.

27      15.   Indian River drivers were not specifically

28  informed of California law regarding rest breaks prior to

1   September 5, 2016.  However, plaintiffs' Complaint does not

2   assert any cause of action based on Indian River's failure to

3   inform plaintiffs or its California drivers of California law

4   regarding rest breaks.  Nor does their Complaint raise any

5   allegation to that effect.

6          16.  On September 5, 2014, plaintiffs filed the present

7   action against Indian River.

8          17.  On June 27, 2016, Indian River provided written

9   notice to the California Department of Industrial Relations of

10  its intent to make payments to current and former California

11  drivers under California Labor Code § 226.2's "Safe Harbor"

12  provision.  (See Def.'s Ex. F-1.)

13         18.  Indian River modified its compensation and payroll

14  system for California drivers on September 5, 2016 in order to

15  comply with California law.  Indian River reduced the piece-rate

16  paid per mile from $.41 to $.14 and now compensates its

17  California drivers separately for rest periods and other

18  nonproductive time at $11.00 per hour.  The transition to the new

19  compensation structure and payroll system, in order to separately

20  track, account for, and pay for productive and nonproductive

21  time, was a lengthy process.  The court does not find that the

22  delay in transitioning to this new compensation and payroll

23  system was unreasonable, given the substantial changes to

24  defendant's payroll structure that had to be implemented during

25  that period of time.

26         19.  This change in compensation structure was not

27  well-taken by Indian River's California drivers, with

28  approximately 20% resigning, leaving Indian River with

1   approximately 35 California drivers in 2017.

2          20.  Since September 5, 2016, Indian River's rest-break

3   policy specifically informs drivers who live in California of

4   their rights to take breaks under California law, and it now

5   separately pays for rest breaks.

6          21.  On December 15, 2016, pursuant to section 226.2's

7   Safe Harbor provision, Indian River paid its current and former

8   California drivers (including plaintiffs) 4% of their gross wages

9   from July 1, 2012 to December 31, 2015, which totaled

10  approximately $282,000.  (Def.'s Ex. F.)  Indian River did not

11  reduce the amount of the Safe Harbor payment based on the

12  percentage of time its drivers worked outside of California.  The

13  only drivers who did not receive such payment were drivers for

14  which the payments were returned by the U.S. Mail due to lack of

15  a current address.

16         22.  Indian River did not make any payments to its

17  drivers for any violations of the California Labor Code's rest

18  break and wage requirements occurring after January 1, 2016.

19         23.  Although plaintiffs' Complaint was filed as a

20  class action on behalf of all California drivers, plaintiffs did

21  not move for class certification under Federal Rule of Civil

22  Procedure 23.  At trial, plaintiffs sought civil penalties for

23  themselves and other California drivers under PAGA, Cal. Labor

24  Code §§ 2698-2699.5, as well as statutory penalties and damages

25  in their individual capacity.

26  II.  Conclusions of Law

27       A.   Work Performed Outside California

28            The California Supreme Court has explained that there

8

1   is a presumption against the extraterritorial application of

2   California law, under which a court should presume the California

3   legislature "did not intend a statute to be operative, with

4   respect to occurrences outside the state, unless such intention

5   is clearly expressed or reasonably to be inferred from the

6   language of the act or from its purpose, subject matter, or

7   history." Sullivan v. Oracle, 51 Cal. 4th 1191, 1207 (2011)

8   (citation and internal punctuation omitted).  This presumption

9   applies "in full force" to California's Unfair Competition Law,

10  as "[n]either the language of the UCL nor its legislative history

11  provides any basis for concluding the Legislature intended the

12  UCL to operate extraterritorially." Id.

13         California law is unclear as to exactly what a

14  California resident must show in order to overcome this

15  presumption and invoke the protection of the California Labor

16  Code's rest break and wage requirements extraterritorially.  See

17  Sarviss v. Gen. Dynamics Info. Tech., Inc., 663 F. Supp. 2d 883,

18  898-99 (C.D. Cal. 2009) ("There is no 'clear express[ion]' of

19  extraterritorial application for California wage and hour

20  laws.").

21         Neither the California Supreme Court nor the Ninth

22  Circuit have established a test for determining when the

23  provisions of the California Labor Code might apply to work

24  performed outside the territorial boundaries of the state.  Lower

25  courts addressing the question examined factors such as the

26  nature of the work being performed, the amount of work being

27  performed in California, the residence of the employee, the

28  residence of the employer, whether the conduct which gives rise

9

1    to liability occurred in California, and the employer's ties to

2    the jurisdiction.  See Oman v. Delta Air Lines, Inc., Case No.

3    15-cv-00131-WHO, 2017 WL 66838, *5-7, --- F. Supp. 3d ---- (N.D.

4    Cal. Jan. 6, 2017); Bernstein v. Virgin Am., Inc., Case No. 15-v-

5    02277-JST, 2017 WL 57307, *7, --- F. Supp. 2d ---- (N.D. Cal.

6    Jan. 5, 2017); Ward v. United Airlines, No. C 15-02309, 2016 WL

7    3906077, *3-5 (N.D. Cal. July 19, 2016); Sarviss, 663 F. Supp. 2d

8    at 900.

9         Looking at these factors, the court in Oman v. Delta

10   Air Lines, Inc., 2017 WL 66838, at *5-7, held that

11   extraterritorial application of certain California Labor Code

12   requirements to California-resident flight attendants was not

13   permissible where the flight attendants spent 14% or less of

14   their time in California, the employer was not based in

15   California, and the nature of the work required working in

16   multiple other jurisdictions in a given pay period or day.

17        Similarly, the court in Ward v. United Airlines, 2016

18   WL 3906077, at *3-5, held that the extraterritorial application

19   of California wage statement requirements to California-resident

20   pilots was impermissible where the pilots spent an average of 12%

21   of their total work time in California, notwithstanding the

22   issuance of the wage statements in California.  In making this

23   determination, the court focused on where the employee

24   "principally worked," rejecting plaintiffs' argument that the

25   pilots' residency was dispositive.[1]  See also Sarviss, 663 F.

26   _____

27        [1]   The court in Ward, 2016 WL 3906077, at *3-5, did not
     distinguish between work performed inside California and work
     performed outside California, given its determination that a
28   certain Labor Code section did not apply at all to employees who

1   Supp. 2d at 900 (holding that certain California wage orders did

2   not apply to a California resident because he did not principally

3   work in California).

4         On the other hand, the California Supreme Court has

5   observed that in some circumstances the Legislature has

6   explicitly extended application of its statutes outside the

7   state's territorial boundaries and may have so intended in other

8   instances.  See Tidewater Marine W., Inc. v. Bradshaw, 14 Cal.

9   4th 557, 577-78 (1996) (state employment law explicitly governs

10  employment outside the state's territorial boundaries in some

11  circumstances, and "[t]he Legislature may have similarly intended

12  extraterritorial enforcement of [Industrial Welfare Commission]

13  wage orders in limited circumstances, such as when California

14  residents working for a California employer travel temporarily

15  outside the state during the course of the normal workday but

16  return to California at the end of the day.").

17        Specifically, the court noted in Tidewater that

18  employees who reside in California, receive pay in California,

19  and work exclusively or principally in California are "wage

20  earner[s] of California" who presumptively enjoy the protections

21  of the state's IWC regulations.  Tidewater, 14 Cal. 4th at 578-

22  79; accord Sullivan, 51 Cal. 4th at 1197-1206 (California

23  overtime law applies to all work within its borders, with the

24  possible exception of work by non-resident employees who enter

25  California temporarily during the course of the workday).

26  _____

27  principally worked outside California.  The court assumes,
    without deciding, that the California Labor Code's wage and rest
    break provisions apply to work performed by California residents
28  inside California.

11

1     There is no evidence that plaintiffs in this case
2  worked exclusively or principally in California.  Such evidence
3  as was presented was to the contrary.  It is apparent from the
4  undisputed evidence that the majority of the drivers' time
5  working was spent outside California.  While California drivers'
6  overall routes usually began or ended in California, the drivers
7  would spend days, weeks, or even months on the road working
8  outside of California.  In other words, the California drivers
9  worked principally outside of California.

10     Courts have also given substantial weight to the fact
11  that the employer is based in California or receives subsidies or
12  other benefits for its California-related work in determining
13  whether its California employees are covered by California laws
14  while working outside the state.  For example, in Bernstein v.
15  Virgin America, Inc., 2017 WL 57307, at *4-8, the court in the
16  Northern District held that extraterritorial application of the
17  California Labor Code to California-resident flight attendants
18  who spent about 25% of their time in California was permissible
19  where the employer was based in California, had its headquarters
20  in California, and had received substantial state subsidies to
21  train its flight attendants; 88-99% of the employer's flights
22  each day either departed or arrived in a California airport; and
23  the wrongful conduct, e.g., the issuance and application of
24  compensation policies, emanated from California.

25     In the present case, in contrast, defendant was neither
26  based nor had its headquarters in California.  Such evidence as
27  was presented, again, was to the contrary. It appears from the
28  undisputed evidence adduced at trial that Indian River was

1  headquartered in Florida, sent drivers payments from that

2  headquarters, and had most of its facilities at that

3  headquarters.  Indian River's compensation structure and rest

4  break policies were developed and applied at Indian River's

5  headquarters in Florida and it trained new employees in Florida.

6       Plaintiffs talk about the Turlock facility as if it

7  were somehow defendant's headquarters.  The evidence at trial

8  could not have been more to the contrary.  What the court learned

9  from the evidence about that facility was that it employed only

10  two dispatchers, performed only minor maintenance, and had a

11  small lounge and space for parking trucks.  Apparently, no routes

12  involved the facility, as loading and unloading occurred at the

13  customer's businesses.  The facility had no permanent bathroom or

14  shower facilities for drivers.  Only a single outdoor porta potty

15  was provided.  Finally, while drivers could submit their

16  paperwork to Indian River from the Turlock facility, they were

17  not required to do so and could submit some, if not all,

18  paperwork at commercial truck rest stops across the country.

19       Thus, because plaintiffs did not work exclusively or

20  principally in California, and defendant was not based or

21  headquartered in California, this case is unlike either Tidewater

22  or Bernstein, and the court must look to the other factors

23  considered by other courts to determine whether plaintiffs have

24  met their burden of overcoming the presumption against

25  extraterritorial application of the California laws in this case.

26       Plaintiffs did establish that they were residents of

27  California, received their wages and wage statements in

28  California, and paid their taxes to the State of California.

13

1   What is clear to the court from the case law, however, is that

2   the mere residency of the plaintiffs in California is

3   insufficient in itself to entitle them to the benefits of the

4   California wage and hour provisions while they are working

5   outside the state.  See, e.g., Sarviss, 663 F. Supp. 2d at 900

6   (noting that the focus on situs of employment as opposed to

7   residence of the employee is consistent with the decisions of

8   California state courts); Ward, 2016 WL 3906077, at *3-5 (same).

9   The California drivers' receipt of wages and wage statements in

10  California is simply a consequence of the drivers' California

11  residency if their wage statements are mailed to their mailing

12  addresses in California.  Similarly, California drivers' payment

13  of California income taxes, which has never been discussed as a

14  relevant factor in any authority cited to the court, is also a

15  result of the drivers' California residency.

16       Beyond showing their California residency, plaintiffs

17  have shown very little in their attempt to overcome the

18  presumption against extraterritorial application of the

19  California laws relating to wages and rest breaks to them while

20  working outside of California.  The nature of the work being

21  performed, truck driving, adds nothing to the analysis.  The

22  conduct which gave rise to the alleged liability was Indian

23  River's practice with regard to wages and rest breaks, which can

24  best be inferred to have been devised and implemented in Indian

25  River's corporate offices in Florida.

26       Plaintiffs point to evidence that Indian River has

27  about 25 customers in California, and the drivers sometimes

28  completed paperwork in and/or sent paperwork to Indian River from

1  California.  However, because the evidence at trial did not

2  establish how much business Indian River conducts in California

3  or nationally, the court cannot draw any significance from the

4  fact of those 25 customers.  The drivers may have sometimes

5  turned in the hard copies of their paperwork at the Turlock

6  facility, but the court gathered from the evidence that the

7  electronic submission, which they could submit from stations in

8  various parts of the country, was the significant transmittal.

9        From the evidence adduced at trial, the court concludes

10  that the presumption against extraterritorial application of

11  California's wage and rest break laws to Indian River's

12  California drivers' work outside California is not overcome.

13  Thus, California's wage and rest break laws do not apply to

14  Indian River's drivers' work performed outside California, and

15  Indian River is entitled to judgment on all of plaintiffs' causes

16  of action with respect to work performed outside California.

17        B.   Work Performed in California

18        Assuming the California Labor Code's wage and rest

19  break provisions apply to work performed in California by Indian

20  River's California drivers,[2] plaintiffs have not met their burden

21  of establishing when any Labor Code violations occurred or what

22  the resulting penalties or damages should be.  Thus, plaintiffs'

23  claims, with respect to work performed in California, fail due to

24  _____

25        [2]   While the California Supreme Court has specifically
    stated that California overtime law applies to all work within
26  its borders, with the possible exception of work by non-resident
    employees who enter California temporarily during the course of
27  the workday, Sullivan, 51 Cal. 4th at 1197-1206, it has not
    addressed whether the California Labor Code's rest break and wage
28  requirements apply to all work within its borders.

1   lack of sufficient proof.

2          Prior to trial, the parties were directed to submit
3   proposed findings of fact and conclusions of law and a proposed
4   form of judgment.  Plaintiffs' submissions, however, made no
5   effort to calculate or even estimate of the number of violations
6   or amount of penalties or damages.  At trial, counsel for
7   plaintiffs assumed and argued that California law applied to all
8   work performed by all California drivers, regardless of the
9   location, and assumed that damages and penalties could be
10  determined simply by estimating the amounts of time spent on
11  various categories of nonproductive work per pay period and
12  looking to the number of pay periods worked by each employee.

13         However, it appears from the evidence that California
14  drivers spent most and sometimes all of their time in a given pay
15  period outside of California.  Thus, plaintiffs' estimates
16  regarding total nonproductive time in a given pay period and the
17  total number of pay periods without reference to where that time
18  was spent are of no assistance to the court.

19         It would be reasonable to assume that plaintiffs spent
20  some time working in California during the relevant time period.
21  But it is not for the court to speculate on how many, if any,
22  uncompensated rest breaks or other breaks occurred while they
23  were in California.  It was plaintiffs' burden to establish that
24  by competent evidence, such as the percentage of work, number of
25  pay periods, or number of hours performed inside California.
26  Plaintiffs made no effort to do so at trial.  Try as it may, the
27  court is unable on its own to reconstruct that information from
28  the evidence before it.

1        At trial, the pay stubs for plaintiffs Shook and

2   Berringer were introduced, which show the total miles driven by

3   the drivers and the beginning and end points of the routes

4   driven.  Such information is insufficient to allow the court to

5   determine what how much time plaintiffs spent in California

6   during a given pay period.  While perhaps such information could

7   be determined through a combination of the drivers' daily logs

8   and pay stubs, mileage charts, and an online map service, the

9   testimony and exhibits introduced at trial leave the court

10  without any feasible method of calculating the proper penalties

11  and damages as to Shook and Berringer, much less all other

12  California drivers, for whom pay stubs and daily logs were not

13  introduced at trial.

14       An examination of the evidence also does not give the

15  court the tools necessary to determine defendants' potential

16  liability.  Defendant introduced charts showing the number of

17  miles driven by <u>all</u> Indian River drivers in each state in a

18  particular quarter.  (<u>See</u> Def.'s Ex. D.)  Such charts do not

19  allow the court to determine what percentage of time, number of

20  pay periods, or number of hours Indian River's <u>California</u> drivers

21  spent working in California overall, much less in any particular

22  pay period.  Indeed, plaintiff's counsel himself criticized the

23  chart due to its failure to show how much time drivers spent in

24  California.

25       Accordingly, plaintiffs' claims for violations

26  occurring within the state of California fail due to their

27  failure to meet their burden of establishing the extent of any

28  violations by Indian River as well as the proper penalties or

1    damages for such violations.  Defendants are thus entitled to

2    judgment on all of plaintiffs' claims with respect to all work

3    performed inside California.

4         C.   Safe Harbor

5              Even assuming the California Labor Code's provisions

6    applied extraterritorially or that plaintiffs met their burden of

7    proof to establish the extent of any violations and accompanying

8    penalties or damages, the court concludes that California's Safe

9    Harbor provision in Labor Code § 226.2 bars plaintiffs' claims.

10             California Labor Code § 226.2(b) provides that if an

11   employer pays its current and former piece-rate employees 4% of

12   their gross wages between July 1, 2012 and December 31, 2015

13   ("the Safe Harbor period"), the employer will have an affirmative

14   defense:

15        to any claim or cause of action for recovery of wages,
          damages, liquidated damages, statutory penalties, or
16        civil penalties, including liquidated damages pursuant
          to Section 1194.2, statutory penalties pursuant to
17        Section 203, premium pay pursuant to Section 226.7,
          and actual damages or liquidated damages pursuant to
18        subdivision (e) of Section 226, based solely on the
          employer's failure to timely pay the employee the
19        compensation due for rest and recovery periods and
          other nonproductive time for time periods prior to and
20        including December 31, 2015.

21   See Fowler Packing Co. v. Lanier, 844 F.3d 809, 811-12 (9th Cir.

22   2016) (discussing section 226.2's Safe Harbor provision).

23             Here, Indian River properly notified the California

24   Department of Industrial Relations of its election to make Safe

25   Harbor payments to its current and former employees on June 27,

26   2016.  Indian River also paid 4% of its current and former

27   employees' gross wages to its current former employees, including

28   plaintiffs, for the period between July 1, 2012 and December 31,

                                   18

1    2015 complied with California Labor Code § 226(b).  Thus,

2    defendant has fully complied with California Labor Code §

3    226(b)'s requirements.

4         1.   Carve-out

5         Even where an employer complies with Labor Code §

6    226.2(b)'s notice and payment requirements, the Safe Harbor

7    defense does not apply to claims exempted under certain "carve-

8    outs" provided in section 226.2(g).  See Fowler, 844 F.3d at 812-

9    13.  One such carve-out, section 226.2(g)(3), provides that the

10   Safe Harbor defense shall not apply to "[c]laims that employees

11   were not advised of their right to take rest or recovery breaks,

12   that rest and recovery breaks were not made available, or that

13   employees were discouraged or otherwise prevented from taking

14   such breaks."  Here, plaintiffs contend that this carve-out bars

15   defendant's Safe Harbor defense because plaintiffs claimed they

16   were not informed of their right to take rest breaks under

17   California law, were not provided rest breaks, and were

18   discouraged from taking rest breaks.

19        However, plaintiffs' Complaint asserts no claim based

20   on Indian River's failure to advise California drivers of their

21   right to take rest or recovery breaks under California law.

22   Rather, the Complaint refers to Indian River's alleged failure to

23   authorize and permit drivers to take rest breaks and failure to

24   separately pay for such breaks, without any mention of a failure

25   to inform drivers of such rights.  (See, e.g., Compl. ¶¶ 4-6, 21,

26   34-37, 46, 56 (Docket No. 4).)  Thus, section 226.2(g)(3)'s carve

27   out for claims that an employer failed to inform its employees of

28   their right to take breaks under California law does not apply

1   and does not bar Indian River's Safe Harbor defense.

2          The court assumes that section 226.2(g)(3)'s carve-out

3   applies to plaintiffs' claim that Indian River failed to provide

4   rest breaks and prevented or discouraged such breaks.  However,

5   the court finds no credible evidence that Indian River failed to

6   provide rest breaks or sought to discourage or prevent drivers

7   from taking such breaks.  As discussed above, the court finds

8   credible the testimony of multiple witnesses that drivers were

9   encouraged to take breaks at any time and as frequently as

10  necessary and that drivers did so.  The court also finds credible

11  the testimony of multiple witnesses that drivers were not

12  discouraged or prevented from taking breaks.  Indeed, plaintiffs

13  Shook and Berringer did not testify that they were prevented or

14  discouraged from taking breaks.  Thus, section 226(g)(3)'s carve-

15  out for claims that claims that rest and recovery breaks were not

16  made available, or that employees were discouraged or otherwise

17  prevented from taking such breaks, does not apply due to lack of

18  sufficient proof and does not bar Indian River's Safe Harbor

19  defense.

20          2.   Scope of Safe Harbor

21          Section 226.2's Safe Harbor provision bars all of

22  plaintiffs' claims based on conduct during the Safe Harbor

23  period, as the affirmative defense applies broadly to any claim

24  for recovery of wages, damages, statutory penalties, civil

25  penalties, and premium pay, including claims based on the failure

26  to pay drivers for nonproductive time under section 226.2(a)(1);

27  failure to provide a proper itemized wage statement under

28  sections 226(a) and 226.2(a)(2); waiting time penalties under

1  section 203; and penalties under PAGA.[3]  Thus, defendants are

2  entitled to judgment on all of plaintiffs' claims with respect to

3  all work performed during the Safe Harbor period.

4              3.   Post Safe-Harbor Period

5              Because Indian River changed its compensation policy

6  and wage statements to comply with California law on September 5,

7  2016, any liability could only be based on conduct from January

8  1, 2016 to September 4, 2016.  Thus there are only 36 pay periods

9  during which there could be violations relating to the non-

10 payment of nonproductive time, and to the non-payment of rest-

11 break time, which would include any derivative claims for

12 statutory or civil penalties.  However, plaintiffs were not

13 employed by Indian River after the Safe Harbor period and thus

14 cannot personally recover penalties or damages for the post-Safe

15 Harbor period.

16             Nor can plaintiffs recover on behalf of other employees

17 for the post-Safe Harbor period.  Shook's and Berringer's claims

18 were extinguished by their receipt of the Safe Harbor payments

19 and they were not employed after the Safe Harbor period.  Thus,

20 they are not "aggrieved employees" under PAGA, at least with

21 respect to the post-Safe Harbor period.  See Cal. Labor Code §

22 ────────────────

23         [3]    The text of Labor Code § 226.2 specifically references
   "civil penalties," i.e., penalties that may be collected only by
   the Labor Commissioner or by an aggrieved employee acting as a

24 private attorney general under PAGA.  See Caliber Bodyworks, Inc.
   v. Superior Court, 134 Cal. App. 4th 365, 377-78 (2d Dist. 2005).

25 Moreover, section 226.2(f) specifically provides that one who has
   paid back wages through the Safe Harbor will void "[a]ny notice

26 to the Labor and Workforce Development Agency on or before
   December 31, 2015, pursuant to paragraph (1) of subdivision (a)

27 of Section 2699.3, alleging violations based upon failure to
   properly compensate employees for rest and recovery periods."

28

1   2699(a), (i); <u>Wassink v. Affiliated Comput. Servs., Inc.</u>, Case

2   No. 8:11-cv-00554-CJC(MLGx), 2011 WL 130377358, at *3 (C.D. Cal.

3   Dec. 21, 2011) (plaintiff must be an "aggrieved employee" to

4   bring a representative PAGA action); <u>accord</u> <u>Thomas v. Home Depot</u>

5   <u>USA, Inc.</u>, 527 F. Supp. 2d 1003, 1009 (N.D. Cal. 2007) (plaintiff

6   could not assert PAGA claim in representative capacity as the

7   statute of limitations had run with respect to his individual

8   PAGA claim).

9        The court accordingly finds that Indian River is

10   entitled to judgment on all of plaintiffs' causes of action based

11   on Indian River's Safe Harbor defense.

12   III. <u>Conclusion</u>

13        For all the foregoing reasons, THE COURT HEREBY FINDS

14   in favor of defendants on all claims by all defendants.[4]  Each

15   side shall bear its own attorneys' fees.  The Clerk of Court is

16   instructed to enter judgment accordingly.

17        IT IS SO ORDERED.

18   Dated:  February 15, 2017

19   _____
     WILLIAM B. SHUBB
20   UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27        [4]     Because the court finds in favor of defendant for the
     reasons above, the court does not address defendant's other
28   arguments raised in its defense.

                                    22